**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Crossfirst Bank, et al., | No. CV-18-01637-PHX-DLR |
| Plaintiffs, | **ORDER** |
| v. | |
| Vieste SPE LLC, et al., | |
| Defendants. | |

Before the Court are Defendants' motions for summary judgment (Docs. 355, 356, 358, 362). Each motion raises the same three arguments (though some raise others): (1) that Plaintiffs did not rely on the allegedly misleading statements in the Official Statement ("OS"); (2) that Plaintiffs fail to identify any misleading or false statement in the OS; and (3) that Plaintiffs' claims are time-barred. Plaintiffs filed an omnibus response dealing primarily with these three arguments (Doc. 372). The motions for summary judgment are granted.

**I.     Background**

This case arises from the sale of certain industrial development bonds sold to finance a waste-management project developed by Vieste.[1] Vieste and the city of Glendale,

---

[1] "Vieste" refers to Mark Branaman, Michael A. Comparato, Sr., Joseph Cook, Donald W. Currise,—individual defendants associated with the Vieste entities—Vieste Energy LLC, Vieste LLC, and Vieste SPE LLC—all Vieste entity defendants. Where appropriate, the Court will individually refer to an individual defendant or Vieste entity by name.

1  Arizona entered a contract titled the Waste Supply Agreement ("Agreement"), whereby
2  Glendale agreed to deliver the city's waste to a materials-recycling facility ("MRF"),
3  operated by Vieste, for processing. (Doc. 362-10.) The purpose of the project was to
4  recover recyclable materials from Glendale's general waste that could then be sold. (Doc.
5  362-6 at 6.) To that end, the Agreement included language defining the types of waste that
6  Vieste would accept for processing and specifying that Glendale would not change the
7  waste composition delivered to the MRF. (Doc. 362-10 at 14, 40.)

8    To finance the project, Vieste worked with the defendant underwriters, HJ Sims and
9  Lawson Financial, to prepare the OS that would accompany a bond offering. (Doc. 362-4
10 at 3; Doc. 362-12 at 9.) The underwriters drafted the OS based on information received
11 from Vieste and Glendale about the project, including financial projections prepared by
12 Vieste based on a 2003 City of Phoenix waste characterization study. (Doc. 362-5 at 3.)
13 Additionally, the credit rating agency Standard and Poor's ("S&P") attended two meetings
14 about the Project, including one meeting on March 20, 2013, at which S&P reviewed
15 Vieste's project plans, the Agreement, and the financial projections. (Doc. 362-3 at 15;
16 Doc. 362-6 at 20–21.) Following its review, S&P assigned the bonds an A+ rating. (Doc.
17 362-17 at 2.) The bonds were initially offered for sale to Qualified Institutional Buyers in
18 2013. (Doc. 362-2 at 3–4.) The offering was accompanied by the OS. (*See* Doc 362-2.)

19   After the bonds were issued, Vieste contracted with Abener, an international
20 contractor and operator, to proceed with the project. (Doc. 362-2 at 24.) Abener then
21 subcontracted with CP Manufacturing to design and construct the MRF. (*Id.* at 25.) The
22 MRF was designed and constructed such that it could not process yard waste. (*See* Doc.
23 362-33 at 4–5.) Glendale began delivering its waste, and the deliveries included significant
24 amounts of yard waste, which the MRF could not process. (*Id.* at 5.) Thus, despite its
25 construction being completed in March 2014, the MRF never reached commercial
26 operations. (*Id.*)

27   A dispute then developed between Vieste and Glendale about whether yard waste
28 was an acceptable type of waste for Glendale to deliver under the Agreement. (*See id.* at

4–5.) The parties litigated the issue in arbitration and later in state court. (Docs. 362-31; 362-32.) An alert posted to Electronic Municipal Market Access ("EMMA") in December of 2014 explained the dispute and the issue with the MRF. (Doc. 362-33 at 4.) Around the same time, bondholders were notified of the dispute and asked to approve a retrofit design of the MRF altered to process yard waste, and S&P downgraded the bonds to a BBB- rating. (Docs. 362-33 at 4; 362-34 at 3.) In March of 2015, the arbitrator ruled in Vieste's favor. (Doc. 362-31.) But later, the state trial court determined that Glendale's interpretation of the contract was correct: Glendale was not to pre-sort waste before delivery, and yard waste was an acceptable type of waste to deliver to the MRF. (Doc. 373-2 at 8, 10–11.)

The remaining plaintiffs are CrossFirst Bank and its subsidiary, CrossFirst Investments, Inc. (collectively, "CrossFirst"), Minnesota Lawyers Mutual Insurance Co. ("MLM"), and Alps Property Casualty Insurance Co. ("ALPS"). (Doc. 209 at 2.) MLM and ALPS purchased the bonds in the initial bond offering. (Docs. 362-23 at 3; 362-24 at 4.) Both companies delegated investment authority to their financial advisor, Sit Investments ("Sit"), and Sit made the ultimate purchasing decision. (Docs. 362-23 at 3; 362-24 at 3–4.) CrossFirst Bank, on the other hand, purchased the bonds in the secondary market about a year after the OS was issued. (Doc. 362-19 at 4.) After less than two months, CrossFirst Bank sold the bonds to CrossFirst Investments at no loss to CrossFirst Bank. (Doc. 362-19 at 3–4.) CrossFirst Investments then purchased additional bonds on the secondary market. (*See* Doc. 362-18 at 6.) CrossFirst worked with an investment advisor, FHN, on the purchases. (Doc. 355-2 at 3.) FHN learned of the bonds through Rush Harding, a broker at Crews and Associates. (*Id.*) In the fallout of the dispute between Vieste and Glendale, MLM, ALPS, and CrossFirst Investments lost their investments in the bonds.

**II.    Procedural Posture**

Plaintiffs filed this suit on April 27, 2018. (Doc. 1-1 at 1, 25.) It began as a putative class action on behalf of "[a]ll purchasers of securities offered for sale through the [OS]." (Doc. 1-1 at 8.) This Court dismissed their original complaint, which asserted Arizona

- 3 -

Securities Act ("Act") claims, as time-barred. (Doc. 85.) Plaintiffs were permitted to amend their complaint to assert common-law fraud and negligent misrepresentation claims.[2] (Doc. 112.) Defendants moved to dismiss those claims on statute of limitations grounds, but the Court allowed the claims to proceed, to allow for factual development on the issue. (Doc. 170.) The Court later denied class certification. (Doc. 275.) Discovery is now closed, and Defendants move for summary judgment. (Docs. 355, 356, 358, 362.)

### III.   Legal Standard

Summary judgment is appropriate if, when viewing the facts in a light most favorable to the nonmoving party, there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are those facts that would affect the outcome of the case, and a dispute is genuine if a reasonably jury could find for the nonmoving party based on the competing evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is also proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The defendant bears the initial burden to show an absence of evidence to support an essential element of the plaintiff's case or an absence of a genuine dispute of material facts. *Id.* at 323. Once the defendant has done so, the burden shifts to the plaintiff, who must "go beyond the pleadings" and use the "kinds of evidentiary materials listed in Rule 56(c)" to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also* Fed. R. Civ. P. 56. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

### IV.   Analysis

Because the Court allowed this case to proceed through discovery to develop facts

---

[2] Plaintiffs also added derivative "aiding and abetting" claims against the Lawson defendants.

necessary to decide whether the claims are time-barred, it is appropriate to deal with Defendants' statutes of limitations argument first. Though the case is not conclusively time-barred, as discussed later, Plaintiffs have failed to demonstrate reliance. Summary judgment is granted on that basis, and the Court need not reach Defendants' other arguments.

> **a. On the record before it, the Court cannot decide, as a matter of law, whether Plaintiffs' causes of actions accrued outside the limitations period or whether Plaintiffs acted unreasonably in failing to investigate their claim upon inquiry notice.**

Ordinarily, when a cause of action accrues is a question of fact to be decided by a jury. *Satamian v. Great Divide Ins. Co.*, 545 P.3d 918, 925 (Ariz. 2024). The discovery rule, adopted in Arizona courts, provides that the statute of limitations for common-law fraud begins to run "when the defrauded party discovers or with reasonable diligence could have discovered the fraud," regardless of whether the party actually learned of it. *Mister Donut of Am., Inc. v. Harris*, 723 P.2d 670, 672 (Ariz. 1986); *see also Coronado Dev. Corp. v. Super. Ct. of Ariz. in and for Cochise Cnty.*, 678 P.2d 535, 537 (Ariz. Ct. App. 1984). The plaintiff need not "know every fact about his fraud claim before the statute begins to run." *Coronado Dev. Corp.*, 678 P.2d at 537. The cause of action accrues when "the plaintiff knows or should have known of both the *what* and *who* elements of causation." *Lawhon v. L.B.J. Institutional Supply, Inc.*, 765 P.2d 1003, 1007 (Ariz. Ct. App. 1988).

Summary judgment can, however, be appropriate in limited circumstances when the failure to investigate potential fraud is not reasonably justified. *Rindlisbacher v. Steinway & Sons Inc.*, 497 F. Supp. 3d 479, 496 (D. Ariz. 2020). Put differently, *Rindlisbacher* suggests that in circumstances where the plaintiff has unreasonably failed to investigate, the fact of inquiry notice may defeat the discovery rule. *Id.* at 498; *see also Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 651 (2010). Inquiry notice is different than accrual: it is the point at which the plaintiff "possesses a quantum of information sufficiently suggestive of

wrongdoing that he should conduct further inquiry." *Reynolds*, 559 U.S. at 650. The rationale behind the discovery rule is that "it is unjust to deprive a plaintiff of a cause of action before [he] has a reasonable basis for believing that a claim exists." *Doe v. Roe*, 955 P.2d 951, 960 (Ariz. 1998) (citation omitted). This policy is not served by tolling the limitations period for a plaintiff who was on inquiry notice but unreasonably failed to perform any investigation.[3]

This Court previously dismissed Plaintiffs' claims under the Act as time-barred at the pleadings stage. But the Court allowed Plaintiffs the opportunity to develop their common-law fraud and negligent misrepresentation claims, as the possibility remained that Plaintiffs could not determine the *cause* of their harm until later than July 2015. The previous dismissal did not reach the issue of causation, as accrual under the Act requires only discovery of the "fraudulent practice." *See Aaron v. Fromkin*, 994 P.2d 1039, 1043 (Ariz. Ct. App. 2000).

Defendants have not offered evidence that Plaintiffs would have discovered the cause of their damages if they had performed a reasonably diligent investigation. In *Rindlisbacher*, the plaintiffs' fraud claim was dismissed as time-barred because the plaintiffs unreasonably failed to investigate their fraud claims upon inquiry notice. 497 F. Supp. 3d at 496. Had they undertaken a reasonably diligent investigation, the plaintiffs would have discovered "historical [piano] sales in the Phoenix market" and "prior Steinway dealer's sales data"—either of which would have alerted them of the cause of their damages. *Id.* at 498–99. This information would have taken little effort to discover; it would have involved merely asking someone the plaintiffs already knew. *Id.* at 499. Because the plaintiffs unreasonably failed to investigate, their claims were barred by the applicable statute of limitations. *Id.* at 498.

---

[3] It is worth noting that some Arizona cases suggest that a fraud claim may accrue upon inquiry notice, rather than discovery, while other cases staunchly follow the discovery rule. *Compare Coronado Dev. Corp.*, 678 F.3d at 537, *with Zowine v. Prussin*, No. CV-14-00892-PHX-GMS, 2016 WL 558550, at *3 (D. Ariz. 2016). This Court understands inquiry notice coupled with an unreasonable failure to investigate (demonstrated by evidence that information about a claim was readily available with a reasonable investigation) to constitute a limited exception to the discovery rule, allowing for a cause of action to accrue at inquiry notice, rather than upon discovery.

The Court agrees with Defendants that Plaintiffs had inquiry notice in 2014, but Defendants offer no evidence of how Plaintiffs would have discovered the cause of their damages or when they would have discovered it. Plaintiffs concede they understood "they knew of losses to their investments in the bonds beginning in 2014." (Doc. 372 at 22.) Further, two notices posted to EMMA alerted Plaintiffs of potential fraud. One stated that S&P downgraded the bonds from an A+ rating to a BBB- rating, and the other stated that the balances in the Debt Service Reserve Fund were below the required minimum. (Docs. 355-15 at 3; 355-17 at 2.) Plaintiffs are sophisticated investors. (Docs. 355-2 at 5; 355-3 at 3.) They monitored these alerts and understood their significance. (Docs. 362-19 at 5; 362-25 at 9.)

Still, there is no evidence that a reasonable inquiry into the basis for these notices would have revealed the "who" that caused their damages. The basis of Plaintiffs' claim is that, before the OS was issued, Defendants all knew or should have known that the contract would allow for Glendale to deliver yard waste, despite that the MRF couldn't process yard waste. (Doc. 372 at 21.) That would make the OS's statements and projections fraudulent. But Glendale and Vieste continued to engage in protracted litigation regarding their contractual obligations to one another through 2017. (*See* Doc. 373-2.) It was not clear from the EMMA notices that *Vieste* was in the wrong. Unlike the defendants in *Rindlisbacher*, Defendants here have not offered evidence of where an investigation following inquiry notice would have led Plaintiffs.[4] And without such evidence, the Court is not able to decide, as a matter of law, that Plaintiffs failure to investigate was so unreasonable as to overcome the protection of the discovery rule.

### b. Plaintiffs fail to carry their evidentiary burden of demonstrating reliance on the allegedly false statements in the OS.

Plaintiffs fail to offer evidence of an essential element of both their claims: reliance.

---

[4] In fact, the underwriter defendants argue that Plaintiffs simply should have "read documents in their possession and draw[n] their own conclusions." (Doc. 385 at 9.) The Court fails to see how this avenue would have been more reasonable than following the litigation.

- 7 -

1    To succeed on both their negligent misrepresentation and fraud claims, Plaintiffs must
2    demonstrate actual reliance on the allegedly misleading or deceptive information
3    disseminated by Defendants. *Dawson v. Withycombe*, 163 P.3d 1034, 1047 (Ariz. Ct. App.
4    2007) (fraud); *In re Allstate Life Ins. Co. Litig.*, 971 F. Supp. 2d 930, 945 (D. Ariz. 2013)
5    (negligent misrepresentation). Reliance can be direct or indirect, but for indirect reliance,
6    the plaintiff must demonstrate that they relied on an individual or source of information
7    that directly relied on the misstatement. *In re Allstate*, 971 F. Supp. 2d at 946–47. To
8    survive summary judgment, "there must be some evidence in the record of reliance." *Sw.*
9    *Non-Profit. Hous. Corp. v. Nowak*, 322 P.3d 204, 212 (Ariz. Ct. App. 2014). Plaintiffs fail
10   to demonstrate reliance, direct or indirect.

### i. MLM & ALPS

12   MLM and ALPS designated Sit to handle the investment decision, and thus, no one
13   from MLM or ALPS reviewed the OS. (Docs. 362-23 at 3; 362-24 at 3–4.) Plaintiffs
14   concede as much. (Doc. 372 at 8.) Thus, to demonstrate reliance, Plaintiffs must show that
15   someone at Sit relied on the OS. *See Nowak*, 322 P.3d at 212. Paul Jungquist, who was a
16   portfolio manager at Sit during the relevant period, testified that he delegated review of the
17   OS to Erik Nelmark, the Sit analyst responsible for performing due diligence on the bonds.
18   (Doc. 362-25 at 3, 5.) But Nelmark could not recall the transaction at all. (Doc. 373-6 at
19   8.) He simply doesn't "remember doing an analysis of this deal, but if [he] did[,] it would
20   have been on the preliminary official statement." (*Id.*) Neither Jungquist nor Nelmark could
21   identify any statements in the OS that they relied on in making the investment decision.
22   (Docs. 362-25 at 8; 362-32-26 at 3.) There is no other evidence to support any degree of
23   reliance on the OS, directly or indirectly, by MLM or ALPS.
24   To contest summary judgment, Plaintiffs argue that testimony offered by Jungquist
25   and Nelmark about what they would have considered important to their investment
26   decision. (Doc. 372 at 9.) This evidence may fairly help to demonstrate the materiality
27   element of the fraud claim, but it does not suffice to show their reliance. The Court cannot
28   accept testimony about what relevant actors *would have done*; rather, the Court can only

consider *what they actually did*. *See Berry v. Robotka*, 453 P.2d 972, 979 (Ariz. Ct. App. 1969); *see also Fed. Election Comm'n v. Toledano*, 317 F.3d 939, 950 (9th Cir. 2002) (deponent's frequent inability to recall pertinent information during deposition justified granting summary judgment); *Giron v. Springboard Inc.*, No. CV-17-04280-PHX-DLR, 2020 WL 9347649, at *6 (D. Ariz. Feb. 7, 2020) (deponent's lack of recollection was "insufficient to create a triable issue of fact"). And since no one testified that they made an investment decision based on the OS or any specific representations made therein, as a matter of law, MLM and ALPS have failed to demonstrate reliance.

### ii. CrossFirst

David O'Toole, Chief Financial Officer and Chief Investment Officer of CrossFirst, made the ultimate decision to invest in the bonds, as he "had the final approval over the investments of the CrossFirst [e]ntities." (Doc. 375-9 at 2.) O'Toole was deposed twice. In the first deposition, he testified that he specifically recalled reviewing the OS, but he could not recall how in-depth of a review he made. (Doc. 373-8 at 8–9.) He believed, however, it would have been only a cursory, high-level review. (*Id.* at 6.) His second deposition contains no record of him testifying about his reliance on the OS at all. (*See* Doc. 375-7.) He could not point to *any* statement in the OS he relied on in making the securities purchase. And while it might be enough to survive summary judgment if O'Toole testified he relied generally on the OS, he did not testify as much. He merely stated that he recalls *reviewing* the OS to some degree in connection with purchasing the bonds; he did not testify as to *relying* on the OS at all. (*See* Doc. 373-8 at 10.)

And CrossFirst cannot claim indirect reliance via their investment advisor, FHN, or FHN's broker, Rush Harding of Crews and Associates. Andy Cates, from FHN, had no recollection of the OS or the financial projections. (Doc. 362-28 at 3–4.) Harding testified that he did not do a thorough analysis of the OS. (Doc. 362-27 at 3.)

### iii. All Plaintiffs

The deficiencies become more apparent when the present case is compared to a substantially similar case from 2013. In *In re Allstate*, the plaintiff claimed that the

- 9 -

bondholders relied either on misstatements in the official statements that accompanied the bond offering *or* on the high investment-grade rating, which was produced based on those official statements. 971 F. Supp. 2d at 935. In fact, the representative of the entity that produced the rating testified that the official statements were a "key document" for review prior to issuing the rating. *Id.* at 947–48. The case survived summary judgment because there was evidence that the bond rating was specifically based on the misrepresentations in the official statements, and in turn, some of the bondholders' purchasing decisions were based on the high rating. *Id.* at 950–51. Thus, there was indirect reliance on the official statements. *Id.*

Here, Plaintiffs have not plead that they relied on the bonds' high rating. They only plead reliance on specific statements in the OS. (Doc. 372 at 2–4.) And yet, when deposed, all the representatives for Plaintiffs testified (to varying extents) about the importance of the bond rating to their investment decisions. (Docs. 362-26 at 4; 362-27 at 4.) They could not, however, show any degree of reliance on any of the alleged misrepresentations made in the OS. Some could not recall reviewing it, let alone relying on it as a key document.

Instead, Nelmark testified that an A+ bond rating meant that he "wouldn't have to verify as many things for [him]self" and that he could use the report rather than reading "as much of the offering statement because there's already things there about the deal that you would be trying to go find normally if [the bond] wasn't rated." (Doc. 362-26 at 4.) As for CrossFirst, Harding testified that "on a bond that's investment-grade rated, the credit report would be the primary due diligence that you would rely upon before offering it to a customer." (Doc. 362-27 at 4.) If there was any reliance in this case, it was on the investment-grade rating, not the statements in the OS. Plaintiffs have failed to demonstrate a genuine dispute of material fact as to whether there was reliance on the alleged misrepresentations in the OS.

### c. O'Toole's sham affidavit does not create a genuine dispute of material fact as to CrossFirst's reliance on the OS.

Plaintiffs respond with a citation to a declaration by O'Toole made after his

1  depositions. (Doc. 375-9.) The declaration identifies several false statements from the OS
2  on which O'Toole claims to have relied on in making his investment decision. (*Id.*)
3  Defendants counter that this is a sham affidavit and cannot serve to create a genuine dispute
4  of material fact about CrossFirst's reliance.

Generally, a party cannot create a dispute of fact at summary judgment by putting forth an affidavit that contradicts prior affidavit testimony. *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012). If a party could raise a factual issue merely by contradicting his prior testimony, it would "greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). "But the sham affidavit rule should be applied with caution because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment." *Yeager*, 693 F.3d at 1080 (quotations and citations omitted). Thus, the sham affidavit rule should only be applied if the Court finds that the contradiction is a sham. *Id.* The "inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998–99 (9th Cir. 2009).

O'Toole's contradiction is a sham. Just like the deponent in *Yeager*, O'Toole "remember[ed] almost nothing about the events central to the case during his deposition, but suddenly recall[ed] those same events with perfect clarity in his declaration in opposition to summary judgment without any credible explanation as to how his recollection was refreshed." *Yeager*, 693 F.3d at 1080. When asked what he specifically recalled reviewing and relying upon in his decision to purchase the bonds, O'Toole testified, "I don't have [a] specific recollection right down to the paragraphs or anything like that." (Doc. 373-8 at 8.) In his subsequent affidavit, he affirmed that, if asked again, he would have

> testified that [he] relied on the statements that represented the Project was designed to be able to operate as a stand-alone facility, and thus had the ability to generate revenue to make the bond payments. [He] also would have testified that [he]

- 11 -

> relied on the financial projections in the OS that represented the MRF would receive a sufficient amount of recyclable waste to be able to generate the projected cash flow. Additionally, [he] would have testified that [he] relied on the truth of the statement that John Lynch was an attorney representing Lawson Financial on the bond transaction, just as [he] rel[ies] on the truth of all factual statements in the OS.

(Doc. 375-9 at 3.) There is a clear inconsistency between his failure to recollect any details about the transaction at his first deposition and his complete and detailed recollection in his declaration.

The only explanation Plaintiffs offer is that O'Toole was only prepared to testify about class certification issues—rather than "merits" issues—at his first deposition. (Doc. 372 at 10.) Plaintiffs' definition of its purported class was a group of investors who "read, reviewed, and relied upon the [OS] before purchasing the Bonds." (Doc. 209 at 7.) Reliance, therefore, is a class certification issue because it relates to the named plaintiffs' ability to adequately represent the class. Indeed, the 30(b)(6) Notice of Deposition required CrossFirst to produce a knowledgeable witness who could testify to CrossFirst's reliance on the OS to determine whether the named plaintiffs met their definition. And "[c]ompanies have a duty to make a conscientious, good faith effort to designate knowledgeable persons for Rule 30(b)(6) depositions and to prepare them to fully and unevasively answer questions about the designated subject matter." *Willy v. Sherwin-Williams Co.*, No. 3:21-cv-00054-AR, 2022 WL 1553703, at *2 (D. Or. May 17, 2022) (citation omitted). Moreover, O'Toole had a second deposition at which Plaintiffs' counsel could have elicited testimony about CrossFirst's reliance on the OS or elaborated on or corrected his previous testimony. (Doc. 372 at 11.) Counsel did not do so. CrossFirst is bound by its 30(b)(6) witness's testimony and cannot contradict it with his subsequent, contradictory affidavit. *Risinger v. SOC, LLC*, 306 F.R.D. 655, 662 (D. Nev. 2015); *Snapp v. United Transp. Union*, 889 F.3d 1088, 1103 (9th Cir. 2018). Plaintiffs bear the burden of establishing reliance at trial, and they have failed to make a showing sufficient to establish its existence here. Summary judgment is thus appropriate. *Celotex Corp.*, 477 U.S. at 322.

**V.    Conclusion**

For the reasons discussed above, the Court grants summary judgment for Defendants. The Court need not reach the other issues raised by Defendants, as Plaintiffs' claims fail due to the absence of evidence of reliance. Because their fraud and negligent misrepresentation claims fail, so too do the derivative aiding and abetting claims.

**IT IS ORDERED** that Defendants' motions for summary judgment (Docs. 355, 356, 358, 362) are **GRANTED**. The Clerk of the Court is directed to enter judgment accordingly and terminate this case.

Dated this 12th day of November, 2024.

Douglas L. Rayes
United States District Judge